Rel: April 4, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2024-2025

_____

## SC-2024-0514

_____

## Ex parte DuPont De Nemours, Inc., et al.

## PETITION FOR WRIT OF MANDAMUS

## (In re: Water Works and Sewer Board of the City of Gadsden

## v.

## DuPont De Nemours, Inc., et al.)

## (Etowah Circuit Court: CV-23-900332)

---

**SC-2024-0515**

---

**Ex parte INV Performance Surfaces, LLC**

**PETITION FOR WRIT OF MANDAMUS**

**(In re: Water Works and Sewer Board of the City of Gadsden**

**v.**

**DuPont De Nemours, Inc., et al.)**

**(Etowah Circuit Court: CV-23-900332)**

MENDHEIM, Justice.

In August 2023, the Water Works and Sewer Board of the City of Gadsden ("Gadsden Water") commenced an action in the Etowah Circuit Court against various corporate defendants and one individual defendant alleging that those defendants had caused Gadsden Water's raw-water intake from the Coosa River to become contaminated with perfluoroalkyl and polyfluoroalkyl substances collectively known as "PFAS." After moving unsuccessfully to have the claims against them dismissed, most of the defendants filed petitions for writs of mandamus seeking orders from this Court directing the circuit court to dismiss the claims against

them.[1] Specifically, DuPont De Nemours, Inc., EIDP, Inc., f/k/a E.I. du Pont de Nemours and Company, Corteva, Inc., and The Chemours Company (collectively referred to as "DuPont"), and Daikin America, Inc. ("Daikin"), seek a writ of mandamus compelling the circuit court to vacate its order denying their motions to dismiss based on a lack of subject-matter jurisdiction -- i.e., a lack of standing -- or the affirmative defense of statute of limitations. Alabama Waste Disposal Solutions, L.L.C., Advanced Disposal Services Alabama, LLC, Advanced Disposal Services Alabama Holdings, LLC, Advanced Disposal Services North Alabama Landfill, LLC, Waste Away Group, Inc., WMX of Alabama, Inc., f/k/a Waste Management of Alabama, Inc., and Nathan Pricket (collectively referred to as "the landfill defendants"), have purported to join DuPont and Daikin's petition, stating that they "adopt and incorporate by reference herein each of the arguments raised by [DuPont and Daikin] in support of the Writ." Landfill defendants' brief, p. 3. INV Performance

---

[1]It appears to this Court that Auto Custom Carpets, Inc., is the only defendant listed in Gadsden Water's complaint that did not attempt to petition this Court for a writ of mandamus following the circuit court's denial of its motion to dismiss.

3

Surfaces, LLC ("INV"),[2] seeks a writ of mandamus compelling the circuit court to vacate its order denying its motion to dismiss based on a lack of specific personal jurisdiction. With respect to DuPont, Daikin, and INV, we grant the petitions and issue the writs.

## I. Facts

On September 22, 2016, Gadsden Water commenced its first action in the Etowah Circuit Court against certain parties that were allegedly responsible for PFAS contamination of Gadsden Water's raw-water intake ("Gadsden I").[3] The Gadsden I complaint, in part, alleged:

"1. Plaintiff, Gadsden Water, has and continues to be damaged due to the negligent, willful and wanton conduct of the Named and Fictitious Defendants, as well as nuisance and trespass caused by the Defendants' past and present release of toxic chemicals, including perfluorinated compounds

---

[2]Along with INV, Gadsden Water's complaint lists as a separate defendant "Invista S.A.R.L., LLC." However, in its mandamus petition, INV explains that "Invista [is] INV's former name." INV's petition, p. 5. Thus, any discussion in this opinion of INV includes Invista.

[3]As we discuss in Part III of this opinion, Gadsden I is curiously absent from the allegations in Gadsden Water's complaint in the present case. In one of its answers to this Court, however, Gadsden Water openly acknowledges the facts underlying Gadsden I. See Gadsden Water's answer in case no. SC-2024-0514, p. 1 ("In 2016, after discovering certain PFAS compounds in its water supply (the Coosa River), Gadsden [Water] sued one PFAS manufacturer, 3M Company, Inc., in the circuit court of Etowah County (along with other defendants not relevant here). … In 2022, Gadsden [Water] settled with 3M (and the others).").

('PFC') perfluorooctanoic acid ('PFOA'), perfluorooctane sulfonate ('PFOS'), and related chemicals from their manufacturing facilities in and around the City of Dalton, Georgia.

"….

"5. As a direct and proximate result of Named and Fictitious Defendants' contamination of the Plaintiff's raw water source, Plaintiff Gadsden Water has suffered substantial economic and consequential damage, including, but not limited to, expenses associated with the future installation and operation of a filtration system capable of removing the Named and Fictitious Defendants' chemicals from the water; expenses incurred to monitor PFC contamination levels; and lost profit and sales."

In Gadsden I, Gadsden Water asserted claims of negligence, nuisance, trespass, and wantonness against the named defendants in that case, and it sought compensatory and punitive damages, as well as injunctive relief.

However, all the Gadsden I defendants entered into settlements with Gadsden Water before a trial occurred. As this Court noted in a case that concerned those settlement agreements:

"[Gadsden Water] thereafter issued a press release informing its customers that it had approved a proposal from an engineering firm to design, bid, and oversee the construction of a new water-treatment facility; that the cost of the water-treatment facility would be paid from the settlement funds received from the defendants; and that the preliminary cost of the project, including contingencies, was approximately $80

million. According to [Gadsden Water], the settlement funds will also be used for the long-term operation and maintenance of the new water-treatment facility."

Zackery v. Water Works & Sewer Bd. of Gadsden, 398 So. 3d 305, 307 (Ala. 2024).[4] We note that this Court is also familiar with Gadsden I from Ex parte Aladdin Manufacturing Corp., 305 So. 3d 214 (Ala. 2019), a case in which we considered petitions for writs of mandamus from defendants in that case whose motions to dismiss based on a lack of personal jurisdiction had been denied by the Etowah Circuit Court. We discuss Aladdin Manufacturing at length in Part III.B. of this opinion.

Gadsden Water commenced this second action ("Gadsden II") by filing a complaint in the Etowah Circuit Court on August 14, 2023. In Gadsden II, Gadsden Water alleges that its raw-water intake from the Coosa River has been contaminated with PFAS due to actions by the named defendants. Gadsden Water again asserts claims of negligence, nuisance, trespass, and wantonness, and it seeks compensatory and

---

[4]In Zackery, this Court considered a plaintiff's appeal from a judgment of the Etowah Circuit Court holding that the Open Records Act, § 36-12-40 et seq., Ala. Code 1975, did not require Gadsden Water to disclose details of the confidential settlement agreements between Gadsden Water and the Gadsden I defendants.

punitive damages, as well as injunctive relief. In part, Gadsden Water's complaint alleges:

"1. Plaintiff, The Water Works and Sewer Board of the City of Gadsden ('Plaintiff' or 'Gadsden') has and continues to be damaged due to the negligent, willful, and wanton conduct of the Named and Fictitious Defendants, as well as the nuisance and trespass caused by the past and present release of toxic chemicals, including per- and poly-fluoroalkyl substances ('PFAS') (other than Aqueous Film Forming Foam) and related chemicals from manufacturing facilities and landfill in the Coosa River Basin.

"….

"3. Certain named and Fictitious Defendants supply chemical products and materials to manufacturing facilities located upstream of Gadsden's water intake sites, in or near the City of Dalton, Georgia. Certain named and Fictitious Defendants use chemical compounds, products, and materials that contain or degrade into PFAS. Industrial wastewater released to the Dalton Utilities public sewer and directly into the environment from manufacturing plants contain high levels of PFAS.

"4. The PFAS sent to Dalton Utilities and other wastewater treatment facilities by the Defendants cannot be treated and removed from the environment by Dalton Utilities prior to migrating to the Conasauga River. The Conasauga River is one of the Coosa River's five major tributaries.

"5. Solid waste also produces PFAS wastewater in the form of landfill leachate from the Dalton-Whitefield Waste Authority's Old Dixie Landfill which sends its landfill leachate to the Dalton public sewer.

"6. Solid waste also produces PFAS wastewater in the form of landfill leachate from the Three Corners Landfill which seeps into Ballplay Creek and contaminates the Coosa River.

"….

"10. As a direct and proximate result of Named and Fictitious Defendants' contamination of the Plaintiff's raw water source, Gadsden has suffered substantial economic and consequential damage, including, but not limited to, expenses associated with the future installation and operation of a filtration system capable of removing PFAS from the water; expenses associated with the removal or remediation of contaminated property; expenses incurred to monitor PFAS contamination levels; and expenses associated with responsible disposal of PFAS laded water.

"….

"15. The Defendants' wrongful acts which form the basis of this Complaint, including the ongoing and continuing trespass and the creation of an ongoing and continuing nuisance, injured Gadsden in Etowah County within the applicable statutes of limitations and/or have caused ongoing and continuing damages suffered by Gadsden within the applicable statutes of limitations.

"….

"18. Defendant Advanced Disposal Services Alabama, LLC is a foreign limited liability company qualified to do business in the State of Alabama and is causing injury in Etowah County.

"19. Defendant Advanced Disposal Services Alabama Holdings, LLC is a foreign limited liability company qualified

to do business in the State of Alabama and is causing injury in Etowah County.

"20. Defendant Advanced Disposal Services North Alabama Landfill, LLC is a foreign limited liability company qualified to do business in the State of Alabama and is causing injury in Etowah County.

"21. Defendant Alabama Waste Disposal Solutions, LLC, is a domestic limited liability company qualified to do business in the State of Alabama and is causing injury in Etowah County. Alabama Waste Disposal Solutions, LLC operates the Three Corners Landfill in Piedmont, Alabama that has leached PFAS into Ballplay Creek and the Coosa River.

"22. Defendant Daikin America, Inc. ('Daikin') is a foreign corporation qualified to do business in the State of Alabama and is causing injury in Etowah County. Defendant Daikin has for many years manufactured and supplied PFAS to carpet mills in and around Dalton, Georgia. Daikin America is the self-professed 'world's foremost developer and manufacturer of fluorochemical products.'

"23. Defendant EIDP, Inc., f/k/a E.I. du Pont de Nemours and Company ('Old DuPont') is a foreign corporation qualified to do business in the State of Alabama and is causing injury in Etowah County. Among other acts and omissions, Defendant EIDP, Inc., f/k/a E.I. du Pont de Nemours and Company has manufactured and supplied PFAS to carpet mills in and around Dalton, Georgia.

"24. Defendant The Chemours Company ('Chemours'), a spin-off of EIDP, Inc., f/k/a E.I. du Pont de Nemours and Company, is a foreign corporation qualified to do business in the State of Alabama and is causing injury in Etowah County. Among other acts and omissions, Defendant Chemours has manufactured and supplied PFAS to carpet mills in and

around Dalton, Georgia. Upon information and belief, Chemours 'remains committed' to fluorine (also known as PFAS) chemistry and continues to make and sell PFAS.

"25. Defendants EIDP, Inc., f/k/a E.I. du Pont de Nemours and Company and the Chemours Company shall hereinafter be referred to collectively as 'DuPont.'

"26. Defendant DuPont de Nemours, Inc. ('New DuPont'), is a foreign corporation causing injury in Etowah County. In 2015, after Old DuPont spun off Chemours, Old DuPont merged with Dow, Inc., not a party to this case, and transferred Old DuPont's historic assets and liabilities to other entities, including New DuPont. In connection with these transfers, on information and belief, New DuPont assumed or purported to assume, certain Old DuPont liabilities -- including those relating to PFAS, as in the instant case. New DuPont's assumption of these liabilities creates contacts sufficient with the State of Alabama such that it is fair to assert jurisdiction over it.

"27. Defendant Corteva, Inc., is a foreign corporation qualified to do business in the State of Alabama and is causing injury in Etowah County. In 2019, New DuPont spun off a new, publicly traded company, Corteva, which currently holds Old DuPont as a subsidiary. In connection with these transfers, on information and belief, Corteva assumed or purported to assume certain Old DuPont liabilities -- including those related to PFAS as in the instant case.

"28. Defendant Invista S.A.R.L, LLC ('Invista') is a foreign limited liability company qualified to do business in the State of Alabama and is causing injury in Etowah County. Defendant Invista has for many years manufactured and supplied PFAS to carpet mills in and around Dalton, Georgia.

"29. Defendant INV Performance Surfaces, LLC ('INV') is a foreign limited liability company qualified to do business

in the State of Alabama and is causing injury in Etowah County. Defendant INV has for many years manufactured and supplied PFAS to carpet mills in and around Dalton, Georgia including owning and operating a fiber manufacturing facility located at 745 College Street in Dalton. Defendant INV, which was formerly owned by DuPont, is the owner of the Stainmaster® brand of carpets, and among other acts and omissions, has for many years manufactured and supplied PFAS to carpet mills in and around Dalton, Georgia.

"30. Defendant Invista S.A.R.L., LLC and INV Performance Surfaces, LLC shall hereinafter be referred to collectively as Invista.

"31. Defendant Nathan Pricket ('Pricket') is the Environmental Protection Specialist for Waste Management. He is an adult resident of the State of Alabama. Mr. Pricket's legally actionable conduct includes failure to maintain environmental protection at Three Corners Landfill in a manner that avoids leachate leaks and contamination of nearby surface waters.

"32. Defendant WMX of Alabama, Inc. fka Waste Management of Alabama, Inc. is a foreign corporation and is causing injury in Etowah County. WMX of Alabama, Inc. is a subsidiary of Waste Management of Alabama, Inc. Upon information and belief, WM owns and operates Three Corners Landfill at 2206 County Road, Piedmont, Alabama 36272.

"33. Waste Away Group, Inc. is a domestic corporation and is causing injury in Etowah County, Alabama. Waste Away Group Inc. is a subsidiary of WM.

"34. Defendants Advanced Disposal Services Alabama, LLC, Advanced Disposal Services Alabama Holdings, LLC, Alabama Waste Disposal Solutions, LLC, WMX of Alabama, Inc. fka Waste Management of Alabama, Inc., Waste Away Group, Inc., and Nathan Pricket shall hereinafter be referred

to collectively as 'Landfill Defendants.' The Landfill Defendants concurrently or in concert own, operate, manage, and maintain the Three Corners Landfill.

"....

"36. PFAS are human-made, synthetic chemicals that do not exist naturally in the environment, are harmful at extremely low levels, and were widely used for decades in consumer, household, and other commercial products, as well as industrial uses. PFAS are a class of nearly 12,000 individual compounds which includes PFOA and PFOS.

"37. Despite the existence of 12,000 individual compounds, current EPA certified laboratory testing methods can only detect less than thirty individual PFAS compounds in drinking water.

"38. Defendants' PFAS and PFAS-containing products are known to contain a number of PFAS impurities and precursors that current laboratory methods cannot yet detect.

"39. The City of Dalton, Georgia is known as the carpet capital of the world and there are over 100 carpet manufacturing plants in Dalton and the surrounding communities. More than 90% of the world's carpet is produced within a 65-mile radius of Dalton. For decades, and despite warnings of the dangerous nature of PFAS, these carpet manufacturing plants have used PFAS (and other related chemicals) in the carpet and flooring manufacturing process.

"40. Defendants are owners and operators of, or the chemical and material suppliers to, leather, textile, flooring, and carpet manufacturing facilities in and around Dalton, Georgia, which use various PFAS and PFAS containing products in the manufacturing process.

"41. Defendants and their mill customers have in the past and continue to release PFAS, their precursors, and related chemicals directly into abutting rivers, in their industrial wastewater, and through leachate generated from solid waste, which is then treated by Dalton Utilities and other wastewater treatment plants, including but not limited to the Looper Bend Wastewater Treatment Plant in Dalton, Georgia, before being sprayed across a 9,800-acre Land Application System ('LAS').

"42. PFAS have been detected in dangerous and high levels in the soil, wastewater, effluent, groundwater, sewage, sludge, biosolids, and compost at the Looper Bend Wastewater Treatment Plant, which borders the Conasauga River.

"43. Defendants DuPont, Daikin, and Invista ('Manufacturing Defendants') manufacture, supply, and sell PFAS and products that contain PFAS which are used in carpet and flooring manufacturing.

"....

"48. Various processes in carpet, textile, and flooring manufacturing generate wastewater that contains PFAS.

"49. PFAS resist degradation during the treatment process utilized by Dalton Utilities. PFAS increases in concentration as waste accumulates in the LAS. The LAS is bordered by the Conasauga River, and runoff and groundwater contaminated with PFAS from the LAS pollutes the river as it flows past the LAS. Defendants have had knowledge for decades that their PFAS cannot be removed from the wastewater sent to Dalton Utilities or other treatment facilities which ultimately reach Etowah County.

"50. In addition to releasing PFAS in industrial wastewater to Dalton Utilities and other wastewater

treatment plants, Defendants have also released PFAS by way of emissions, leaks and spills into stormwater drains and sewers which feed into local creeks, streams, and rivers that ultimately reach the Coosa River in Etowah County.

"....

"57. The United States Environmental Protection Agency ('EPA'), the University of Georgia ('UGA'), and the Georgia Environmental Protection Division ('EPD') have identified industrial wastewater from manufacturing facilities in and around Dalton, Georgia as the source of PFAS being applied to the LAS and entering the Conasauga River.

"....

"60. In 2009, based on the science available at that time, EPA published provisional drinking water health advisories for short-term exposure (weeks to months) to PFOA and PFOS.

"61. On May 19, 2016, due to the evolution of the science surrounding the health effects associated with the consumption of PFOA and PFOS in drinking water, EPA published a lifetime Drinking Water Health Advisory of 70 ppt (0.07 ppb) for combined concentrations of PFOA and PFOS ('May 2016 EPA Health Advisory' or 'Health Advisory limit').

"62. On June 15, 2022, the EPA again lowered the 2016 Drinking Water Health Advisory to 0.004 ppt for PFOA and 0.02 ppt for PFOS. It also issued new drinking water health advisories for 10 ppt for GenX compounds and 2,000 ppt for PFBS.

"63. While Defendants have long been aware of the persistence and toxicity of certain chemicals, Defendants have knowingly and intentionally caused releases of these

14

chemicals into the rivers and watersheds which supply drinking water to Gadsden.

"....

"68. Daikin America is the self-professed 'world's foremost developer and manufacturer of fluorochemical products' and 'largest supplier of flourorepellents [sic] in the world.'

"69. Upon information and belief, Daikin sold PFAS soil and stain resistant chemistry under the Unidyne brand name to carpet mills in Dalton, Georgia.

"70. Upon information and belief, Daikin continues to sell PFAS chemistry, manufactured in Alabama and elsewhere, for use in the carpet, textile, paper, and automotive industries.

"71. Daikin continues to offer for sale Unidyne TG-2211, a soil resist[ance] chemical applied by carpet mills through foam or spray application, and Unidyne TG-251, a water, oil, and soil resistance chemical applied by carpet mills through exhaust and spray. Upon information and belief, both chemicals are PFAS chemistry products.

"....

"74. In 2002, EPA took regulatory action under the Toxic Substances Control Act to limit the future manufacture of PFOA, PFOS, and related chemicals based on the persistence and toxicity of these chemicals. In response, Manufacturing Defendants undertook to develop and manufacture and supply PFAS with six or fewer carbons, such as GenX, referred to as Short-Chain PFAS.

"75. Defendants are aware that, like PFOA and PFOS, these Short-Chain PFAS are also not subject to

biodegradation, can accumulate in human blood, and pose a risk to human health.

"76. Gadsden's testing for PFAS has consistently found levels of PFOS and PFOA that exceed the new 2022 EPA Health Advisory levels. In addition, Gadsden has found other PFAS in its water supply, including Short-Chain PFAS.

"77. Gadsden's current water filtration systems are not designed for removing PFAS to levels below the 2022 EPA Health Advisory levels.

"....

"82. As a direct and proximate result of Defendants' contamination of Gadsden's water supply, Gadsden has been damaged by, including, but not limited to, past and future monitoring and testing expenses, PFAS containing sludge disposal costs, potential lost revenues and profits, and expenses in remediating Defendants' contamination."

In summary, Gadsden Water alleges that DuPont and Daikin are manufacturers and sellers of PFAS products and that INV is a manufacturer and supplier of PFAS products. Gadsden Water further alleges that those defendants' PFAS products were sold at some point in time to carpet manufacturers in Dalton, Georgia, and that the carpet manufacturers in Dalton then discharged PFAS-contaminated wastewater to a wastewater-treatment facility operated by Dalton Utilities. According to Gadsden Water, Dalton Utilities failed to adequately treat that wastewater, and then it sprayed the wastewater

16

onto a 9,800-acre area called the Land Application System ("LAS"). Gadsden Water alleges that runoff from the LAS migrated into the Oostanaula River, which then ran into the Conasauga River, which is one of the five major tributaries of the Coosa River. It is undisputed that the Coosa River is Gadsden Water's raw-water-intake source.[5]

On March 29, 2024, INV filed a motion to dismiss all claims against it. INV argued, among other things, that the Etowah Circuit Court lacked general and specific jurisdiction over INV. In support of its motion, INV submitted an affidavit from Lance Leggett, INV's Director of Quality and Environmental Health and Safety. Leggett first testified to several facts concerning INV's lack of contacts with Alabama: (1) INV is a Delaware limited-liability company; (2) INV's principal place of business is Wichita, Kansas; (3) INV does not have any personnel that work out of Alabama; and (4) INV has never operated a carpet-manufacturing facility, or any other type of manufacturing facility, in Alabama. Next, Leggett stated several facts that sought to disavow any relationship between INV and Dalton carpet mills or Dalton Utilities:

---

[5]Gadsden Water alleges that the landfill defendants independently and directly contaminated the water supply, but those allegations are not central to the issues examined in this opinion.

"7. INV has never operated a carpet manufacturing facility or a fiber manufacturing facility in Georgia, including in or around the Dalton area. Although INV operated a facility in an office park located at 745 College Drive in Dalton for a period of time after 2004, no commercial manufacturing operations were performed there, and no PFAS were used in or discharged from manufacturing processes there. Instead, the Dalton facility performed small-scale, laboratory testing of materials for the carpet industry.

"8. INV has never held any Dalton Utilities industrial user discharge permits for discharging wastewater to Dalton Utilities.

"9. INV has never discharged or otherwise released -- including by way of wastewater, solid waste, air emissions, stormwater, or directly to any river -- PFAS from any carpet manufacturing facility, or any other type of manufacturing facility in Georgia, including in or around the Dalton area.

"....

"14. INV did not instruct or direct any Dalton-area carpet mill customers to discharge wastewater to Dalton Utilities or the Dalton Utilities LAS or otherwise make any carpet mill-specific wastewater assessments or determinations."

Finally, Leggett sought to explain the extent of INV's relationship with

PFAS products:

"12. INV has never manufactured PFAS -- in Georgia, Alabama, or any other location. INV is not, and never has been, a PFAS manufacturer.

"13. Instead, since 2004, INV has manufactured carpet fibers, which it has sold to carpet mills, including in the

18

Dalton, Georgia area. INV historically packaged its fiber sales with certain topical formulations to be applied to carpet fiber during the carpet manufacturing process. Although INV's carpet fiber never contained PFAS of any kind, certain topical formulations supplied with INV fiber before January 2019 contained certain PFAS-containing fluorochemicals, which were sourced from third-party PFAS manufacturers."

Also on March 29, 2024, Daikin filed a motion to dismiss all claims asserted against it. Daikin argued, among other things, that Gadsden Water's allegations in Gadsden I made it clear that Gadsden Water had filed its claims against Daikin after the applicable statutory limitations periods for those claims had expired. Daikin also contended that Gadsden Water lacks "standing" to assert its claims because its alleged injuries were fully remedied by the settlements executed in Gadsden I. On April 2024, DuPont filed a motion to dismiss all claims asserted against it. Like Daikin, DuPont argued that Gadsden Water had filed its claims beyond the expiration of the applicable statutory limitations periods.

On May 28, 2024, Gadsden Water filed separate responses in opposition to each of the defendants' motions to dismiss. Gadsden Water disputed the contention that its claims against DuPont and Daikin were barred by the applicable statutes of limitations because, it said, those defendants had "caused a continuing tort." Gadsden Water did not

19

dispute INV's contention that the circuit court lacked general jurisdiction over INV.[6] With respect to INV's argument that the circuit court lacked specific personal jurisdiction, Gadsden Water contended that INV had "intentionally directed its PFAS into Alabama subjecting [INV] to personal jurisdiction in [the Etowah Circuit Court]." In support of that argument, Gadsden Water submitted excerpts from deposition testimony of William Heim, a former DuPont and later INV employee, from litigation in City of Rome, Georgia, v. 3M Company et al. In that deposition, Heim testified that: (1) he began working for INV in 2004; (2) during his employment with DuPont and INV, both companies became concerned about PFAS being discharged into river water; (3) INV sold a PFAS-related chemical named N-119 at some point between 1995 and 2007; (4) during his employment with INV, INV owned PFAS-application equipment in some Dalton carpet-mills; and (5) INV owned PFAS-application equipment in one or two Alabama carpet mills in 2006.[7]

---

[6]Gadsden Water also did not dispute INV's assertion that it was a supplier, not a manufacturer, of PFAS products.

[7]Gadsden Water asserts that Heim's testimony and the documentary evidence submitted with it showed that "INV owned PFAS-application machinery on site at carpet mills, including a mill in

On May 29, 2024, the circuit court held a hearing concerning the multiple motions to dismiss filed by the various defendants in Gadsden II. At that hearing, Etowah Circuit Judge William Ogletree noted that he still had the case files from Gadsden I "[i]n a box. It's in my office actually in a box," he said, because he had presided over the Gadsden I litigation. In light of that, Judge Ogletree asked counsel for Gadsden Water: "What differentiates this case from Gadsden One?" Gadsden Water's counsel answered the question in reference to personal jurisdiction, stating that INV had been sued in Gadsden II as a PFAS supplier, whereas most of the defendants in Gadsden I were PFAS manufacturers.

On July 2, 2024, the circuit court entered an order that denied the motions to dismiss filed by each of the defendants in Gadsden II. The order did not detail the circuit court's reasoning for its order.

On August 14, 2024, INV filed a petition for a writ of mandamus to this Court, seeking an order directing the circuit court to vacate its July 2, 2024, order and to dismiss the claims against INV based on a lack of personal jurisdiction. On August 15, 2024, DuPont and Daikin filed a

_____

Alabama." Gadsden Water's answer in case no. SC-2024-0515, p. 3 (emphasis in original). INV asserts that "Heim testified that INV owned equipment in two Alabama carpet mills in 2006." INV's petition, p. 26.

21

joint petition for a writ of mandamus to this Court, seeking an order directing the circuit court to vacate its July 2, 2024, order and to dismiss the claims asserted against them based on a lack of subject-matter jurisdiction -- i.e., a lack of standing -- or the bar imposed by the applicable statutes of limitations.

## II. Standard of Review

"A writ of mandamus is an extraordinary remedy available only when the petitioner can demonstrate: '"(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court."' Ex parte Nall, 879 So. 2d 541, 543 (Ala. 2003) (quoting Ex parte BOC Grp., Inc., 823 So. 2d 1270, 1272 (Ala. 2001))."

Ex parte Watters, 212 So. 3d 174, 180 (Ala. 2016).

As we noted in the rendition of the facts, in case no. SC-2024-0514, DuPont and Daikin seek a writ of mandamus in response the circuit court's denial of their motions to dismiss based on a lack of subject-matter jurisdiction -- i.e., a lack of standing -- or the bar of the applicable statutes of limitations. For reasons we discuss in Part III of this opinion, we see no need to include the standard of review for petitions that challenge the subject-matter jurisdiction of a trial court. As to DuPont and Daikin's statute-of-limitations argument,

22

>     "'[t]his Court has recognized that an appeal is an inadequate remedy in cases where it has determined that a defendant should not have been subjected to the inconvenience of litigation because it was clear <u>from the face of the complaint</u> that the defendant was entitled to a dismissal or to a judgment in its favor.'

> "<u>Ex parte Sanderson</u>, 263 So. 3d 681, 687-88 (Ala. 2018) (citing <u>Ex parte Hodge</u>, 153 So. 3d 734 (Ala. 2014), and <u>Ex parte U.S. Bank Nat'l Ass'n</u>, 148 So. 3d 1060 (Ala. 2014)). In particular, in <u>Ex parte Hodge</u>, this Court permitted mandamus review of a trial court's denial of a motion to dismiss contending that the plaintiff's malpractice claim was barred by the four-year statute of repose contained in § 6-5-482(a), Ala. Code 1975, when the applicability of that statute was clear from the face of the complaint. Cf. <u>Ex parte Watters</u>, 212 So. 3d [174,] 182 [(Ala. 2016)] (denying a mandamus petition because 'it [was] <u>not</u> abundantly clear from the face of [the plaintiff's] complaint whether the survival statute dictate[d] dismissal of the legal-malpractice claim because the issue whether the claim sound[ed] in tort, in contract, or in both for that matter, [was] sharply disputed by the parties'). Thus, if it is clear from the face of [the plaintiff's] complaint that the claims against [the defendants] are barred by the rule of repose or the applicable statute of limitations, then [the defendants are] entitled to mandamus relief."

<u>Ex parte Abbott Lab'ys</u>, 342 So. 3d 186, 193-94 (Ala. 2021).

As we also observed in the rendition of facts, in case no. SC-2024-0515, INV seeks a writ of mandamus in response to the circuit court's denial of its motion to dismiss based on a lack of specific personal jurisdiction.

23

"'"[A] petition for a writ of mandamus is the proper device by which to challenge the denial of a motion to dismiss for lack of <u>in personam</u> jurisdiction. See <u>Ex parte McInnis</u>, 820 So. 2d 795 (Ala. 2001); <u>Ex parte Paul Maclean Land Servs., Inc.</u>, 613 So. 2d 1284, 1286 (Ala. 1993). '"An appellate court considers de novo a trial court's judgment on a party's motion to dismiss for lack of personal jurisdiction."' <u>Ex parte Lagrone</u>, 839 So. 2d 620, 623 (Ala. 2002) (quoting <u>Elliott v. Van Kleef</u>, 830 So. 2d 726, 729 (Ala. 2002)). Moreover, '[t]he plaintiff bears the burden of proving the court's personal jurisdiction over the defendant.' <u>Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.</u>, 290 F.3d 42, 50 (1st Cir. 2002)."

"'<u>Ex parte Dill, Dill, Carr, Stonbraker & Hutchings, P.C.</u>, 866 So. 2d 519, 525 (Ala. 2003).'

"<u>Ex parte Covington Pike Dodge, Inc.</u>, 904 So. 2d 226, 229 (Ala. 2004).

"....

"… Alabama courts use the following established procedure for treatment of motions to dismiss based on a lack of personal jurisdiction under Rule 12(b)(2), Ala. R. Civ. P.

"'"'In considering a Rule 12(b)(2), Ala. R. Civ. P., motion to dismiss for want of personal jurisdiction, a court must consider as true the allegations of the plaintiff's complaint not

24

controverted by the defendant's affidavits, <u>Robinson v. Giarmarco & Bill, P.C.</u>, 74 F.3d 253 (11th Cir. 1996), and <u>Cable/Home Communication Corp. v. Network Productions, Inc.</u>, 902 F.2d 829 (11th Cir. 1990), and "where the plaintiff's complaint and the defendant's affidavits conflict, the ... court must construe all reasonable inferences in favor of the plaintiff." <u>Robinson</u>, 74 F.3d at 255 (quoting <u>Madara v. Hall</u>, 916 F.2d 1510, 1514 (11th Cir. 1990)).'"

"'<u>Wenger Tree Serv. v. Royal Truck & Equip., Inc.</u>, 853 So. 2d 888, 894 (Ala. 2002) (quoting <u>Ex parte McInnis</u>, 820 So. 2d 795, 798 (Ala. 2001)). However, if the defendant makes a prima facie evidentiary showing that the Court has no personal jurisdiction, "the plaintiff is then required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and he may not merely reiterate the factual allegations in the complaint." <u>Mercantile Capital, LP v. Federal Transtel, Inc.</u>, 193 F. Supp. 2d 1243, 1247 (N.D. Ala. 2002) (citing <u>Future Tech. Today, Inc. v. OSF Healthcare Sys.</u>, 218 F.3d 1247, 1249 (11th Cir. 2000)). See also <u>Hansen v. Neumueller GmbH</u>, 163 F.R.D. 471, 474-75 (D. Del. 1995) ("When a defendant files a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2), and supports that motion with affidavits, plaintiff is required to controvert those affidavits with his own affidavits or other competent evidence in order to survive the motion.") (citing <u>Time Share Vacation Club v. Atlantic Resorts, Ltd.</u>, 735 F.2d 61, 63 (3d Cir. 1984)).'

"Covington Pike Dodge, 904 So. 2d at 229-30."

Ex parte Aladdin Mfg. Corp., 305 So. 3d at 224-25.

## III. Analysis

Because the bases upon which DuPont and Daikin seek the dismissal of Gadsden Water's claims against them are different than the basis upon which INV seeks a dismissal, we will address the arguments in their respective petitions separately in accordance with their assigned case numbers.

### A. Case No. SC-2024-0514: The DuPont-Daikin Petition

#### 1. Standing

DuPont and Daikin first contend that Gadsden Water lacks "standing" to assert its claims against them because Gadsden Water "no longer has any tangible, concrete injury" because Gadsden Water "has received full compensation through the settlement in Gadsden I to build a new water-treatment plant that will both (1) provide 'PFAS-free drinking water' to the Gadsden Water customers and (2) 'meet the [ ] [new environmental] standards well before they become effective.'" DuPont-Daikin petition, p. 12. In support of that argument, DuPont and Daikin quote from Gadsden Water press releases provided to its

customers that discussed the Gadsden I settlement and from the observation of this Court in Zackery that was quoted in the rendition of facts that "a new water-treatment facility … would be paid from the settlement funds received from the defendants" in Gadsden I. Zackery, 398 So. 3d at 307.

We see no need to consider at length DuPont and Daikin's "standing" argument because of the distinct absence of any discussion from DuPont and Daikin of our previous cases that have

> "limited the concept of standing, as necessary to invoke subject-matter jurisdiction, to application in 'public-law' cases. [Gardens at Glenlakes Property Owners Ass'n, Inc. v. Baldwin Cnty. Sewer Serv., LLC, 225 So. 3d 47, 51-53 (2016) (plurality opinion)] (citing Wyeth, Inc. v. Blue Cross & Blue Shield of Alabama, 42 So. 3d 1216 (Ala. 2010), and Ex parte BAC Home Loans Servicing, LP, 159 So. 3d 31 (Ala. 2013))."

Ex parte Baldwin Cnty. Sewer Serv., LLC, [Ms. SC-2023-0723, Sept. 6, 2024] __ So. 3d __, __ (Ala. 2024). Even if we assume that DuPont and Daikin are correct that Gadsden Water is seeking a double-recovery in Gadsden II for what was redressed by the settlement in Gadsden I, that is a damages issue -- an issue concerning whether Gadsden Water has stated viable claims against DuPont and Daikin -- not an issue of subject-matter jurisdiction.

In their reply brief, DuPont and Daikin -- perhaps recognizing the foregoing problem with seeking mandamus review on this point -- assert that "standing principles apply to [Gadsden Water's] complaint" because Gadsden Water has asserted claims of public nuisance. DuPont-Daikin reply brief, p. 8. In support of that proposition, DuPont and Daikin cite Ex parte Young, 352 So. 3d 1160, 1169 (Ala. 2021), which, they say, stands for the proposition that "claims brought by private plaintiffs under private rights of action 'f[a]ll within the definition of a public-law case' for standing purposes when public concerns are implicated." Id. However, Young involved a prisoner who had sued public officials concerning their official duties. In that context, the Court stated:

> "May and Lindley contend that Foster lacks standing to sue because, they contend, he fails to allege a particularized injury in his complaint. We first note that Foster is a private individual asserting a claim against May and Lindley, a public official and a public employee, respectively, under the Open Records Act. Because this is a public-law case, the concept of standing applies. See Poiroux v. Rich, 150 So. 3d 1027, 1039 (Ala. 2014) (determining that the case was brought by private individuals against various state officials and involved the constitutionality of fees imposed pursuant to statute and concluding, therefore, that the case fell within the definition of a public-law case and that the concept of standing applied)."

28

Ex parte Young, 352 So. 3d at 1169. DuPont and Daikin have failed to cite a single authority for the proposition that asserting a claim of public nuisance against private parties renders an action a "public-law case" to which standing principles apply.[8] Our previous cases make it clear that the issue DuPont and Daikin raises is a cause-of-action issue, not a subject-matter-jurisdiction issue. Accordingly, mandamus review is not available for their argument.

2. Statutes of Limitations

DuPont and Daikin also contend that Gadsden Water's claims against them are barred by the applicable statutes of limitations. As we noted in the "Standard of Review" portion of this opinion, the denial of a motion to dismiss based on a statute-of-limitations defense is reviewable by a mandamus petition if it is clear from the face of the complaint that

---

[8]DuPont and Daikin similarly cite Ex parte Wilson, 288 So. 3d 442, 444 (Ala. 2019), for the proposition that "the relevant question -- once the mandamus categories are satisfied, as they undisputedly are here -- is whether the plaintiff has stated a viable claim for relief as a matter of law." DuPont-Daikin reply brief, p. 11. But Wilson involved claims against State university officials who asserted that they were entitled to immunity under Article I, § 14, Ala. Const. 2022. In other words, Wilson plainly involved a mandamus category -- State immunity -- and it was a public-law case. Wilson is simply not analogous to this case.

the defendant was entitled to a dismissal on that basis. The statute-of-limitations period for Gadsden Water's negligence, nuisance, and wantonness claims is two years. See § 6-2-38(l), Ala. Code 1975. The statute-of-limitations period for Gadsden Water's trespass claims is six years. See § 6-2-34(2), Ala. Code 1975.

> " 'The statute of limitations begins to run when the cause of action accrues, which this Court has held is the date the first legal injury occurs.' Ex parte Integra LifeSciences Corp., 271 So. 3d 814, 818 (Ala. 2018). 'A cause of action accrues as soon as the claimant is entitled to maintain an action, regardless of whether the full amount of the damage is apparent at the time of the first legal injury.' Chandiwala v. Pate Constr. Co., 889 So. 2d 540, 543 (Ala. 2004)."

Ex parte Abbott Lab'ys, 342 So. 3d at 194.

DuPont and Daikin argue:

> "The beginning of the limitations period could not be more plain in this case: Gadsden I, filed in the same circuit court as Gadsden II and making the same allegations on the basis of the same alleged injury, conclusively establishes that [Gadsden Water's] injury manifested and its claims were known no later than September 22, 2016."

DuPont-Daikin petition, p. 15 (emphasis in original). As we noted in the rendition of facts, Gadsden Water commenced the present action on August 14, 2023. Thus, if September 22, 2016, is the accrual date of Gadsden Water's first legal injury, then Gadsden Water indisputably

30

asserted its claims against DuPont and Daikin beyond the expiration of the applicable limitations periods.

DuPont and Daikin support their contention that September 22, 2016, is the latest accrual date for Gadsden Water's first legal injury by referencing Gadsden Water's fact allegations in Gadsden I. In its Gadsden I complaint, Gadsden Water alleged: "Gadsden Water began regular testing for PFOA and PFOS in its water supply following the issuance of the May 2016 EPA health advisory, and has consistently found PFOA and PFOS levels that combine to meet or exceed the 0.07 ppb limit." In referencing that allegation of fact, DuPont and Daikin expressly ask this Court to take judicial notice of the proceedings in Gadsden I. See DuPont-Daikin petition, p. 15 n.5.

Gadsden Water first responds to DuPont and Daikin's argument by contending that this Court cannot consider the allegations it presented in Gadsden I for purposes of reviewing a motion to dismiss the Gadsden II complaint.

> "[DuPont and Daikin] fail to provide any authority demonstrating how Gadsden I can serve as legal grounds to dismiss Gadsden II based on the statute of limitations. The closest they come is in a single footnote. (Pet. at n 5). The fundamental problem: none of the cases cited in this footnote

31

reviewed a motion to dismiss based on the statute of limitations. Instead, the cases analyzed the limited circumstances in which a trial court can take judicial notice of prior proceedings. None of those cases abrogated the well-established standard of review when evaluating a trial court's denial of a motion to dismiss: a review limited to the allegations contained in the complaint."

Gadsden Water's answer in case no. SC-2024-0514, pp. 20-21 (emphasis in original).

This Court has stated that "[w]hen a party refers to another proceeding or judgment of a court in his pleading before that same court, the court on motion to dismiss may take judicial notice of the entire proceeding." Lesley v. City of Montgomery, 485 So. 2d 1088, 1093 (Ala. 1986). We have already noted that Gadsden I was before the same court -- indeed, the same trial judge -- as Gadsden II. But, what is glaringly absent from Gadsden Water's allegations of fact in its Gadsden II complaint is any reference to the filing of its Gadsden I complaint -- even though Gadsden Water readily admits to the existence of that previous action in its answer to this Court in case no. SC-2024-0514. In other words, Gadsden Water argues that, because the face of its complaint in Gadsden II does not mention Gadsden I, this Court cannot take judicial notice of the allegations of fact in its Gadsden I complaint and that,

therefore, those allegations cannot serve as a basis for when Gadsden Water's causes of action accrued for purposes of the applicable statutes of limitations.

There are multiple problems with Gadsden Water's argument. First, in their motions to dismiss in the circuit court, both DuPont and Daikin argued that Gadsden Water's fact allegations in Gadsden I foreclosed its assertion of claims against them in Gadsden II because those fact allegations demonstrated that Gadsden Water was on notice of its injuries due to PFAS water contamination in September 2016. In those motions, DuPont and Daikin also asked the circuit court to take judicial notice of the pleadings filed in Gadsden I. Yet, in its responses to those motions to dismiss, Gadsden Water never argued that the circuit court could not or should not consider the Gadsden I complaint in considering whether Gadsden Water's claims in Gadsden II were barred by the applicable statutes of limitations. Gadsden Water likewise made no such suggestion in the May 29, 2024, hearing at which Gadsden I was frequently discussed. Indeed, at the May 29, 2024, hearing, the circuit court acknowledged the existence of Gadsden I and asked Gadsden Water's counsel several questions about Gadsden I in relation to Gadsden

II. As the rendition of facts relates, Judge Ogletree asked Gadsden Water's counsel about what differentiated Gadsden II from Gadsden I. He also asked Gadsden Water's counsel how many PFAS suppliers had been sued in Gadsden I. Therefore, the circuit court clearly took judicial notice of the proceedings in Gadsden I, and we see no reason why we cannot take judicial notice of the Gadsden I complaint.[9] In fact, as we noted in the rendition of facts, this Court already was familiar with Gadsden I because of our decisions in Aladdin Manufacturing and in Zackery.[10]

_____

[9]Ordinarily, a "'circuit court cannot take judicial notice of its record in another case for the purpose of supplying evidence in the case at hand, as the record in the other case must be introduced in evidence if it is to be considered as evidence.'" Municipal Workers Comp. Fund, Inc. v. Morgan Keegan & Co., 190 So. 3d 895, 911 (Ala. 2015) (quoting 2 Charles W. Gamble & Robert J. Goodwin, McElroy's Alabama Evidence § 484.02(2) (6th ed. 2010)). However, "[t]he trial court is not in error if inadmissible testimony comes in without objection and without a ruling thereon appearing in the record. The testimony is thus generally admissible and not limited as to weight or purpose." Ex parte Neal, 423 So. 2d 850, 852 (Ala. 1982).

[10]In Aladdin Manufacturing, this Court observed that, "[o]n September 22, 2016, Gadsden Water filed an action in the Etowah Circuit Court seeking injunctive relief and damages based on claims of negligence, wantonness, nuisance, and trespass on the same factual basis as that contained in the complaint in the Cherokee County case." 305 So.

As we have noted, a comparison of Gadsden Water's complaint in Gadsden I with its complaint in Gadsden II reveals the absence of any mention of Gadsden I in the Gadsden II complaint. Moreover, unlike the Gadsden I complaint's allegation that "Gadsden Water began regular testing for PFOA and PFOS in its water supply following the issuance of the May 2016 EPA health advisory," the Gadsden II complaint is curiously missing any allegation of when Gadsden Water first learned about the presence of harmful levels of PFAS in its water supply. The closest Gadsden Water comes in the Gadsden II complaint to providing some factual detail in that regard is the following:

> "61. On May 19, 2016, due to the evolution of the science surrounding the health effects associated with the consumption of PFOA and PFOS in drinking water, EPA published a lifetime Drinking Water Health Advisory of 70 ppt (0.07 ppb) for combined concentrations of PFOA and PFOS ('May 2016 EPA Health Advisory' or 'Health Advisory limit').

> "62. On June 15, 2022, the EPA again lowered the 2016 Drinking Water Health Advisory to 0.004 ppt for PFOA and

---

3d at 224. Thus, this Court was plainly aware of the fact allegations presented in Gadsden I.

Aside from that obvious fact, Gadsden Water's sudden objection to taking judicial notice of its Gadsden I complaint is bewildering given that the Gadsden I complaint is Gadsden Water's first attachment in its appendix to its answer in case no. SC-2024-0514.

0.02 ppt for PFOS. It also issued new drinking water health advisories for 10 ppt for GenX compounds and 2,000 ppt for PFBS.

"....

"76. Gadsden [Water's] testing for PFAS has consistently found levels of PFOS and PFOA that exceed the new 2022 EPA Health Advisory levels. ..."

Those allegations directly relate to one of the ways Gadsden Water attempts to avoid the implications of its fact allegation in Gadsden I that it became aware in May 2016 of harmful levels of PFAS in its water supply. Gadsden Water argues that "[t]he 2022 Interim Lifetime Health Advisory" ("the LHA") from the Environmental Protection Agency ("the EPA") "created a newly manifest injury." Gadsden Water's answer in case no. SC-2024-0514, p. 23. Specifically, according to Gadsden Water, "Gadsden II addresses a completely new and different injury, the nuisance caused by [DuPont's and Daikin's] specific PFAS at levels that exceed the 2022 LHA." Id., p. 25. In support of its assertion that the EPA's establishment of a new, lower threshold for levels of PFAS in drinking water constitutes a new injury, Gadsden Water asserts that its "injury is comparable to that in West Pratt Coal Co. v. Dorman, [161 Ala. 389,] 49 So. 849 (Ala. 1909)." Id., p. 24.

36

"In West Pratt Coal, plaintiff's upper soil cracked open and settled down several years after mining had taken place beneath the surface. Plaintiff brought suit within one year after the soil settled. In stating that the statute [of limitations] had not run, the Court held that the plaintiff had nothing of which to complain until the enjoyment of the lot was interfered with by the settling of the soil, i.e., no cause of action had 'accrued' until that time."

Garrett v. Raytheon Co., 368 So. 2d 516, 519 (Ala. 1979), overruled on other grounds by Griffin v. Unocal Corp., 990 So. 2d 291 (Ala. 2008).

Gadsden Water misses the point in West Pratt Coal, which was that no injury to the plaintiff's property had been sustained until the soil settlement. Here, the scenario is entirely different. In the Gadsden I complaint, Gadsden Water stated that "Gadsden Water began regular testing for PFOA and PFOS in its water supply following the issuance of the May 2016 EPA health advisory, and has consistently found PFOA and PFOS levels that combine to meet or exceed the 0.07 ppb limit." Thus, in 2016, the amount of PFAS in Gadsden Water's raw-water intake already had exceeded the EPA's 2016 LHA limit. In other words, harm to the water source initially occurred in 2016. The fact that in 2022 the EPA lowered its acceptable threshold of PFAS in drinking water did not create a new injury to Gadsden Water that restarted the applicable limitations periods. To put it in terms of the analogy to West Pratt Coal, the new

2022 EPA LHA limit was like further soil settlement that followed the original harm. In Abbott Laboratories, this Court reiterated that "'[a] cause of action accrues as soon as the claimant is entitled to maintain an action, regardless of whether the full amount of the damage is apparent at the time of the first legal injury.'" 342 So. 3d at 194 (quoting Chandiwala v. Pate Constr. Co., 889 So. 2d 540, 543 (Ala. 2004)) (emphasis added). Under that rule, the EPA's 2022 LHA limit did not create a new manifest injury to Gadsden Water.

In a related vein, Gadsden Water contends that it has stated a new injury because "Gadsden II seeks to recover damages related to [DuPont's and Daikin's] PFAS which are distinct from the specific PFAS manufactured by the only PFAS manufacturer in Gadsden I, 3M." Gadsden Water's answer in case no. SC-2024-0514, pp. 21-22. That argument seemingly refers to the following allegations in the Gadsden II complaint:

> "74. In 2002, EPA took regulatory action under the Toxic Substances Control Act to limit the future manufacture of PFOA, PFOS, and related chemicals based on the persistence and toxicity of these chemicals. In response, [DuPont and Daikin] undertook to develop and manufacture and supply PFAS with six or fewer carbons, such as GenX, referred to as Short-Chain PFAS.

"75. Defendants are aware that, like PFOA and PFOS, these Short-Chain PFAS are also not subject to biodegradation, can accumulate in human blood, and pose a risk to human health.

"76. … Gadsden [Water] has found other PFAS in its water supply, including Short-Chain PFAS."

Gadsden Water did not argue to the circuit court, as it does to this Court, that DuPont and Daikin's PFAS "are distinct from 3M's PFAS down to the molecular level." Gadsden Water's answer in case no. SC-2024-0514, p. 22. That is probably because the Gadsden II complaint does not bear out a meaningful distinction between the types of PFAS that Gadsden Water attempts to make to this Court. The Gadsden II complaint does not state when Gadsden Water discovered the presence of the allegedly distinct DuPont-Daikin PFAS in its water supply as opposed to PFAS from 3M. The absence of such an allegation is particularly important given that the Gadsden II complaint states that DuPont and Daikin started developing "Short-Chain PFAS" in 2002. Moreover, with respect to the alleged harm caused by DuPont and Daikin, the Gadsden II complaint simply states that DuPont and Daikin "manufacture, supply, and sell PFAS and products that contain PFAS

which are used in carpet and flooring manufacturing." The <u>Gadsden II</u> complaint also states:

> "10. As a direct and proximate result of Named and Fictitious Defendants' contamination of [Gadsden Water's] raw water source, Gadsden [Water] has suffered substantial economic and consequential damage, including, but not limited to, expenses associated with the future installation and operation of a filtration system capable of removing PFAS from the water; expenses associated with the removal or remediation of contaminated property; expenses incurred to monitor PFAS contamination levels; and expenses associated with responsible disposal of PFAS laded water."

Again, no distinction is drawn in the <u>Gadsden II</u> complaint between the harm caused by the distinct DuPont-Daikin PFAS and other PFAS that allegedly have contaminated Gadsden Water's raw-water intake. Furthermore, as DuPont and Daikin observe, "both types of PFAS … require the same remediation," i.e., special filtration of the water supply. DuPont-Daikin reply brief, p. 18. Thus, the fact that DuPont and Daikin manufacture a specific type of PFAS does not constitute a new injury that establishes a more recent accrual date for injury than when Gadsden Water's first legal injury for PFAS contamination accrued in 2016.

Gadsden Water also argues that its claims against DuPont and Daikin are not foreclosed by the applicable statutes of limitations because the <u>Gadsden II</u> complaint alleged a continuous tort. "This Court has used

40

the term 'continuous tort' to describe a defendant's repeated tortious conduct which has repeatedly and continuously injured a plaintiff." <u>Moon v. Harco Drugs, Inc.</u>, 435 So. 2d 218, 220 (Ala. 1983). Gadsden Water contends that, "[w]hen viewed in the light most favorable to Gadsden [Water], the complaint does not allege [Dupont's or Daikin's] conduct ended at any point in time, much less prior to the expiration of any statute of limitations." Gadsden Water's answer in case no. SC-2024-0514, p. 16. In support of that argument, Gadsden Water specifically highlights the following allegations from the <u>Gadsden II</u> complaint:

> "22. Defendant Daikin America, Inc. ('Daikin') is a foreign corporation qualified to do business in the State of Alabama and is causing injury in Etowah County. Defendant Daikin <u>has for many years manufactured and supplied PFAS to carpet mills in and around Dalton, Georgia</u>. Daikin America is the self-professed 'world's foremost developer and manufacturer of fluorochemical products.'

> "23. Defendant EIDP, Inc., f/k/a E.I. du Pont de Nemours and Company ('Old DuPont') is a foreign corporation qualified to do business in the State of Alabama and is causing injury in Etowah County. Among other acts and omissions, Defendant EIDP, Inc., f/k/a E.I. du Pont de Nemours and Company <u>has manufactured and supplied PFAS to carpet mills in and around Dalton, Georgia</u>.

> "24. Defendant The Chemours Company ('Chemours'), a spin-off of EIDP, Inc., f/k/a E.I. du Pont de Nemours and Company, is a foreign corporation qualified to do business in the State of Alabama and is causing injury in Etowah County.

41

Among other acts and omissions, Defendant Chemours has manufactured and supplied PFAS to carpet mills in and around Dalton, Georgia. Upon information and belief, Chemours 'remains committed' to fluorine (also known as PFAS) chemistry and continues to make and sell PFAS.

"....

"43. Defendants DuPont [and] Daikin … manufacture, supply, and sell PFAS and products that contain PFAS which are used in carpet and flooring manufacturing.

"....

"68. Daikin America is the self-professed 'world's foremost developer and manufacturer of fluorochemical products' and 'largest supplier of flourorepellents [sic] in the world.'

"69. Upon information and belief, Daikin sold PFAS soil and stain resistant chemistry under the Unidyne brand name to carpet mills in Dalton, Georgia.

"70. Upon information and belief, Daikin continues to sell PFAS chemistry, manufactured in Alabama and elsewhere, for use in the carpet, textile, paper, and automotive industries.

"71. Daikin continues to offer for sale Unidyne TG-2211, a soil resist[ance] chemical applied by carpet mills through foam or spray application, and Unidyne TG-251, a water, oil, and soil resistance chemical applied by carpet mills through exhaust and spray. Upon information and belief, both chemicals are PFAS chemistry products."

(Emphasis added.)

In response, DuPont and Daikin highlight the distinction this Court emphasized in Abbott Laboratories with respect to continuous torts between continuing conduct and continuing consequences that result from a defendant's conduct.

> "In Abbott, the Mobile County Board of Health and the Family Oriented Primary Health Care Clinic (collectively referred to as 'Mobile Health') sued over 60 defendants, including Abbott Laboratories and Abbott Laboratories, Inc. (collectively referred to as 'Abbott'). In its complaint, 'Mobile Health alleged that Abbott had participated in the marketing of a specific prescription drug, Oxycontin.' 342 So. 3d at 188. Mobile Health alleged that the defendants 'had caused a public nuisance in the form of an opioid epidemic.'"

Ex parte McKesson Corp., 393 So. 3d 1180, 1196 (Ala. 2023). In Abbott Laboratories, this Court concluded:

> "[T]he specific allegations against Abbott in the complaint do not mention conduct of any kind by Abbott after 2006. This is important because there must be a connection between the defendant's actions and the ongoing tort. …
>
> "In short, the fact that the alleged opioid epidemic itself was ongoing at the time Mobile Health filed its original complaint does not mean that Abbott's conduct in relation to the epidemic is not subject to the statute of limitations. As the Court explained in Payton[ v. Monsanto Co., 801 So. 2d 829 (Ala. 2001)]:
>
> > "'Alabama law does not recognize a continuing tort in instances where there has been a single act followed by multiple consequences.[2]

43

"'_____

> "'[2]<u>Moon v. Harco Drugs, Inc.</u>, 435 So. 2d 218, 220-21 (Ala. 1983), discusses <u>the concept of "continuous tort," describing it as a defendant's liability for repeated wrongs to the plaintiff</u>. Then, the Court offers several illustrations, including "when a plaintiff landowner seeks damages for the contamination of a well or stream." <u>Id.</u> at 221. However, the three cases cited to support this proposition involve <u>repetitive acts or ongoing wrongdoing</u>; <u>Howell v. City of Dothan</u>, 234 Ala. 158, 174 So. 624 (1937) (ongoing discharge of sewage), <u>Employers Insurance Co. of Alabama v. Rives</u>, 264 Ala. 310, 87 So. 2d 653 (1955) (opinion refers to repetitive acts), <u>Alabama Fuel & Iron Co. v. Vaughn</u>, 203 Ala. 461, 83 So. 323 (1919) (damage resulting from the ongoing operations of a coal mine).'

"801 So. 2d at 835 (emphasis added). There are no allegations of ongoing wrongdoing <u>by Abbott</u> within two years of the date Mobile Health filed its original complaint. Therefore, Mobile Health's general allegation of a continuous public nuisance does not save its claims against Abbott from the statute-of-limitations bar."

<u>Ex parte Abbott Lab'ys</u>, 342 So. 3d at 195-96 (some emphasis added).

In light of the foregoing distinction between conduct and consequences, DuPont and Daikin argue:

"Gadsden [Water] <u>knows</u> -- indeed knows from [DuPont's and Daikin's] own records, which Gadsden [Water] has from

44

Gadsden I[11] -- that [DuPont's and Daikin's] alleged tortious conduct (sales of PFAS-containing products to the carpet mills in Dalton, Georgia) has stopped completely. All Gadsden [Water] can allege are continuing consequences. But what matters is not continuing consequences, but continuing conduct -- and Gadsden [Water] alleges (and can allege) none."

DuPont-Daikin petition, pp. 19-20 (emphasis in original).

In other words, DuPont and Daikin contend that Gadsden Water has alleged that the consequences of their previous actions have resulted in PFAS remaining in the Coosa River, but that Gadsden Water has not alleged that Dupont's and Daikin's allegedly wrongful conduct occurred within two years or six years of the filing of Gadsden Water's August 14, 2023, complaint. Therefore, DuPont and Daikin insist, under Abbott Laboratories, Gadsden Water has not alleged a continuous tort against them within the applicable limitations periods.

---

[11]In their petition, DuPont and Daikin assert that, "[d]uring the course of that lawsuit [Gadsden I], Gadsden [Water] subpoenaed sales records from … Daikin" and that "[t]he DuPont Petitioners took part in joint depositions served by Gadsden [Water] and cross-noticed in another PFAS-related case, The Water Works and Sewer Board of the Town of Centre v. 3M Co., Inc., et al., No. CV-2017-900049 (Cherokee Cnty. Cir. Ct.)." DuPont-Daikin petition, p. 16 & n.6. DuPont and Daikin briefly and weakly contend that this Court can take judicial notice of the referenced discovery materials, but they cite scant authority for doing so in relation to our review of a circuit court's denial of a motion to dismiss, and we decline the invitation.

45

Gadsden Water rejoins that <u>McKesson Corporation</u> demonstrates that DuPont and Daikin are misapplying the holding in <u>Abbott Laboratories</u> to the facts in this case. Gadsden Water observes that in <u>McKesson Corporation</u> this Court stated:

> "[I]t is clear that in <u>Abbott</u> <u>this Court did not hold that a complaint alleging a continuous tort must include specific factual allegations regarding a defendant's conduct that purportedly occurs during the limitations period</u>. Rather, our decision was based on the fact that the complaint in that case included specific factual allegations showing that Abbott's alleged misconduct had ended more than two years before the filing of the complaint in that case."

393 So. 3d at 1202 (emphasis added). Gadsden Water asserts that the <u>Gadsden II</u> complaint "pleaded that [DuPont and Daikin] continue to produce and sell PFAS to facilities located in the Coosa River Basin. These same products contaminate [Gadsden Water's] water supply. [Thus,] Gadsden [Water] has and continues to be damaged due to [DuPont's and Daikin's] continued conduct." Gadsden Water's answer in case no. SC-2024-0514, p. 18.

Gadsden Water is correct that <u>McKesson Corporation</u> distinguished <u>Abbott Laboratories</u> on the basis that the plaintiff in <u>Abbott Laboratories</u> had expressly pleaded that Abbott's allegedly wrongful conduct had ceased long before the limitations period had expired, whereas the

46

plaintiffs in McKesson Corporation had not similarly stated that the defendants' conduct had ceased. Gadsden Water is also correct that its complaint in Gadsden II does not state that certain conduct by DuPont and Daikin has ceased. However, that particular aspect of Abbott Laboratories is not important here.

What matters is Abbott Laboratories' observation that "there must be a connection between the defendant's actions and the ongoing tort." 342 So. 3d at 195. As DuPont and Daikin put it: "[Gadsden Water's] 'continuing conduct' constitutes [DuPont's and Daikin's] purported sale of … PFAS elsewhere." DuPont-Daikin petition, p. 21 (emphasis in original). "[Gadsden Water's] complaint does not allege (nor could it) that [DuPont or Daikin] sold or supplied PFAS to Dalton carpet mills within the limitations period." DuPont-Daikin reply brief, p. 16 (emphasis in original). It must be remembered that Gadsden Water's theory of the case is that wastewater from Dalton carpet mills was discharged to Dalton Utilities, which, in turn, sprayed PFAS-contaminated wastewater onto the LAS, and runoff from the LAS seeped into rivers that eventually led to the Coosa River. Thus, DuPont's and Daikin's allegedly tortious conduct was the sale of PFAS products to Dalton carpet mills. But the

Gadsden II complaint's allegations expressly avoid stating that DuPont and Daikin continue to sell PFAS products to Dalton carpet mills. To be sure, the Gadsden II complaint states that, in the past, DuPont and Daikin "manufactured and supplied PFAS to carpet mills in and around Dalton, Georgia." The complaint also generally alleges that, currently, "DuPont [and] Daikin … manufacture, supply, and sell PFAS and products that contain PFAS which are used in carpet and flooring manufacturing," but that allegation tellingly does not state that those PFAS products are sold or used by Dalton carpet mills. Even when the Gadsden II complaint is more specific with respect to the types of PFAS products Daikin "continues to offer for sale," it does not state that Daikin sells those products to Dalton carpet mills. In short, the Gadsden II complaint does not allege ongoing tortious conduct against DuPont and Daikin that is connected to the continuing contamination of the Coosa River. Instead, it alleges that DuPont and Daikin generally continue to manufacture and sell PFAS products. But without a connection between that general conduct and the conduct that allegedly contaminates Gadsden Water's raw-water intake -- the Dalton carpet mills' wastewater applied by Dalton Utilities to the LAS -- Gadsden Water has not asserted

48

a continuous tort against DuPont and Daikin within the applicable limitations periods.

Finally, Gadsden Water argues that its pleading of an abatable nuisance means that its action against DuPont and Daikin is not foreclosed by the applicable statutes of limitations. See Gadsden Water's answer in case no. SC-2024-0514, pp. 19-20. However, an abatable nuisance is a form of continuous tort. See, e.g., City of Birmingham v. Leberte, 773 So. 2d 440, 444 (Ala. 2000) (noting that "'[f]or an abatable nuisance the cause of action does not arise until the harmful consequences occur, and each occurrence or recurrence of such damages constitutes a separate cause of action.'" (citation and emphasis omitted)). Indeed, as DuPont and Daikin observe, the primary continuous-tort claim discussed in Abbott Laboratories was the plaintiff's claim of public nuisance. See Ex party Abbott Lab'ys, 342 So. 3d at 194. When "[t]here are no allegations of ongoing wrongdoing by [the defendant] within two years of the date [the plaintiff] filed its original complaint," the "general allegation of a continuous public nuisance does not save [the plaintiff's] claims against [the defendant] from the statute-of-limitations bar." Id. at 196 (emphasis omitted). Thus, based on the reasoning provided above

concerning why Gadsden Water failed to allege a continuous tort against DuPont and Daikin, we conclude that Gadsden Water's abatable-nuisance claim is also barred by the applicable statute of limitations.[12]

B. Case No. SC-2024-0515: The INV Petition

As we noted earlier in this opinion, INV seeks a writ of mandamus directing the circuit court to vacate its July 2, 2024, order denying its motion to dismiss and to enter an order dismissing Gadsden Water's claims on the ground that the circuit court lacks specific personal jurisdiction over INV.

> "'The touchstone of specific jurisdiction is whether the defendant has "'purposefully avail[ed] itself of the privilege of conducting activities within the forum State.'" Ford Motor Co. [v. Montana Eighth Jud. Dist. Ct.], 592 U.S. [351] at 35[9], 141 S. Ct. [1017] at 1024 [(2021)] (quoting Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958))…. Crucially, specific jurisdiction must be based on "'the defendant's contacts with the forum state that are related to the cause of action'" in the suit at hand, and, though these contacts "'need not be continuous and systematic,'" they must be substantial enough that the defendant could fairly

---

[12]We note that although the landfill defendants have purported to join the DuPont-Daikin petition for a writ of mandamus in its entirety, in their motion to dismiss in the circuit court, as well as in their short brief to this Court, the landfill defendants did not argue that the claims Gadsden Water asserted against them were barred by the applicable statutes of limitations. Because the landfill defendants did not move for a dismissal of the claims against them on that basis, we do not grant a petition for the writ of mandamus in favor of the landfill defendants.

anticipate a suit in the forum state. [Elliott v. Van Kleef, 830 So. 2d 726] at 730 [(Ala. 2002)] (quoting Ex parte Phase III Constr., Inc., 723 So. 2d 1263, 1266 (Ala. 1998) (Lyons, J., concurring in the result)); see also Walden v. Fiore, 571 U.S. 277, 284, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014) (stressing that "the defendant's suit-related conduct must create a substantial connection with the forum State" (emphasis added)).'"

Sawyer v. Cooper Tire & Rubber Co., [Ms. SC-2023-0603, Sept. 6, 2024] __ So. 3d __, __ (Ala. 2024) (quoting Pruitt v. AAA Interstate Transp., LLC, 358 So. 3d 1144, 1149-50 (Ala. 2022)).

"The analytical framework used for determining whether specific jurisdiction exists consists of two primary requirements. First, there must be an indication that [INV] has 'purposefully availed' [itself] of the privilege of conducting activities within Alabama. [Facebook, Inc. v. K.G.S., 294 So. 3d 122, 132 (Ala. 2019)]. Specifically, there must be (1) a 'substantial connection' '"between [INV] and [Alabama] necessary for a finding of minimum contacts"' and (2) those contacts '"must come about by an action of [INV] purposefully directed toward [Alabama]."' Id. (quoting Elliott[ v. Van Kleef], 830 So. 2d [726,] 731 [(Ala. 2002)]) …. This requirement '"assures that [INV] will not be haled into [Alabama] as a result of '"the unilateral activity of another person or a third person."'"' Id. (quoting Elliott, 830 So. 2d at 731, quoting in turn Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), quoting in turn Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 417, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). Second, [INV's] action must '"'arise[] out of or relate[] to [INV's] contacts with [Alabama].'"' Id. at 134 (quoting Daimler AG v. Bauman, 571 U.S. 117, 127, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014), quoting in turn Helicopteros, 466 U.S. at 414 n.8, 104 S.Ct. 1868)."

51

Ex parte M.E.J., 392 So. 3d 52, 61 (Ala. 2023) (emphasis omitted and emphasis added) (plurality opinion).

Gadsden Water's contention that the circuit court may exercise personal jurisdiction over INV runs into the stark problem that all the evidence submitted indicates that INV has no contacts with Alabama -- except that it apparently owned carpet-mill equipment in one or two Alabama carpet mills as of 2006. However, with respect to that contact, Gadsden Water has made no allegation that any PFAS were discharged from the Alabama mills at any time or that PFAS from those mills contaminated Gadsden Water's raw-water intake in any way, shape, or form.

Consequently, Gadsden Water is forced to rely upon INV's suit-related conduct in Georgia. Specifically, Gadsden Water attributes the following conduct to INV:

"INV sold PFAS-containing products to carpet mills in and around Dalton, Georgia. …

"INV was aware of and 'concerned about' the actual discharge of PFAS-laden wastewater resulting from the carpet manufacturing process. …

"INV sold, serviced, and maintained its PFAS application machinery to carpet mills, including a carpet mill in Alabama. …

"INV was on notice through public studies that the carpet manufacturing process, which utilized INV's PFAS products, was polluting the Conasauga River, which flows downstream via the Coosa River into Alabama. …"

Gadsden Water's answer in case no. SC-2024-0515, pp. 8-9. Gadsden Water argues that the alleged foregoing knowledge and conduct by INV constituted sufficient acts for "purposefully avail[ing] itself of the privilege of conducting activities within [Alabama]." Hanson v. Denckla, 357 U.S. 235, 253 (1958).

"INV's conduct here goes beyond blindly dropping an item into the stream of commerce. INV was aware the PFAS products it was supplying to carpet mills would eventually pollute water in Alabama. INV was integral to the maintenance and operation of its machinery applying PFAS to carpet products. INV knew that wastewater created through the carpet manufacturing process contained PFAS. To continue to sell its PFAS products to carpet mills in and around Dalton, INV knew that the PFAS-laden byproduct necessarily produced by these mills would flow into Alabama. Through this direct knowledge -- which was integral to INV's business model -- INV purposefully availed itself of the privilege of conducting business in Alabama through its exploitation of the Alabama market. Ford[ Motor Co. v. Montana Eighth Jud. Dist. Ct.], 592 U.S. [351,] 359 [(2021)]."

Gadsden Water's answer in case no. SC-2024-0515, pp. 9-10.

As INV points out, Gadsden Water takes liberties with its evidence concerning INV's involvement with the application of PFAS at Dalton carpet mills and INV's knowledge that wastewater from Dalton carpet mills would end up in rivers. Gadsden Water relies upon Heim's testimony for those assertions, but, as INV observes, Heim seems to have been referring to DuPont, not to INV, in his testimony on those matters. See INV's petition, pp. 23-24; INV's reply brief, pp. 9-10. For example, with respect to being present at Dalton carpet mills, Heim testified:

> "Q. [Counsel for Rome, Georgia:] And the entire system is something <u>DuPont would send folks like yourself out into the field</u> to observe how those chemicals are applied and how they are mixed and how it's done; correct?
>
> "A. [Heim:] That's correct.
>
> "Q. So someone doesn't get the wrong idea, you weren't just sending a 50-gallon drum or a big tote [of chemicals] --
>
> "A. Tote.
>
> "Q. -- out to a manufacturer and then just waiting for the next order. I mean. I mean -- let me say it another way. Y'all provide a service as part of [it] in addition to providing a product.
>
> "A. Sure. That's right.
>
> "Q. And that would create follow up.
>
> "A. Absolutely.

"Q. And you would have <u>representatives of DuPont in these manufacturing facilities</u>; correct?

"A. That's true.

"Q. You know people on a first-name basis.

"A. Probably.

"Q. I mean, you know your customers on a first-name --

"A. Sure.

"Q. And so -- and I know these questions may be very obvious to you because it's been your life's work and you've been out in Dalton. I'm trying to -- trying to make sure I understand how it works. But you worked hand in hand with your customers. <u>When I say you, I mean DuPont. Right</u>?

"A. <u>Exactly</u>.

"Q. And -- and if one of your customers was applying the product wrong or getting the wrong -- getting the wrong end result, y'all would be there to correct it.

"A. Or find out why and correct it."

(Emphasis added.) In the foregoing testimony, Heim was clearly referring to DuPont, not to INV, being present at Dalton carpet mills.

Concerning knowledge about carpet-mill wastewater containing PFAS and where that wastewater would end up, Heim testified:

"Q. [Counsel for Rome, Georgia:] In the post-2000 time frame, you heard or did you know that fluorochemicals were found in the Conasauga River there in Dalton?

"A. [Heim:] I was aware that there -- there was -- there were things that were found --

"Q. All right.

"A. -- that were associated with C8.[13]

"Q. In the -- in the river.

"A. Yeah.

"Q. And you understood that cities like the town I represent, Rome, Georgia, rely on those rivers for their drinking water; correct?

"A. Yes, sir.

"Q. All right. So -- and you also knew and DuPont knew that Dalton Utilities was accepting this wastewater with C8s in it; right?

"[Opposing counsel:] Object to form. If you'll separate what DuPont knew and what he knew --

"[Counsel for Rome, Georgia:] Okay.

"[Opposing counsel:] -- I'll withdraw my objection.

"Q. [Counsel for Rome, Georgia:] I'll ask it two ways; okay? Did you understand, based on your personal knowledge,

_____

[13]C8 is an abbreviation for a perfluorochemical (PFC) known as perfluorooctanoic acid (PFOA).

that wastewater from the carpet manufacturers was getting into the Conasauga River?

"A. Had to be.

"Q. Had to be. Because that wastewater from the manufacturers was going to Dalton Utilities; right?

"A. That's correct.

"Q. And Dalton Utilities, their -- their land application system, which you're aware of, is right there by the river, correct?

"A. I'm vaguely aware of that. I don't know how close it is to the river.

"….

"Q. [Counsel for Rome, Georgia:] Let me ask that again. I'm asking you are you aware that C8 was getting into the Conasauga River there at Dalton Utilities?

"A. I mean, yeah, basically."

(Emphasis added.) In the foregoing testimony, it is not even clear that the knowledge Heim admitted to possessing was attributable to DuPont, and INV was never mentioned.

Even with respect to Heim's testimony about being "concerned" about PFAS being discharged into rivers, his testimony was unclear as to whether he was referring to DuPont, to INV, or to both.

"Q. [Counsel for Rome, Georgia:] … <u>During your time at DuPont and then [INV]</u>, did you ever hear anyone at your company say they were concerned about the perfluorochemicals, the C8s that were being discharged by your carpet customers and ending up in the rivers?

"A. [Heim:] In terms of C8 --

"Q. Yes.

"A. -- when that was determined --

"Q. Yes.

"A. -- and we -- we obviously were concerned about that. We didn't -- we didn't recognize it as a health hazard, a speculation around it -- there was speculation on it, but we did recognize the need to, let's move away from it, which we did."

(Emphasis added.)

Moreover, even if it is assumed that Heim's testimony established that INV knew that PFAS products it sold along with carpet fibers to carpet mills would end up in wastewater, as INV notes, that evidence demonstrates only that

"the alleged unilateral actions of the carpet mills, and then Dalton Utilities, were foreseeable to INV. … But that does not change the analysis. Because 'foreseeability alone' cannot make a defendant responsible for the 'unilateral activity' of another. <u>Ex parte City Boy's Tire [& Brake, Inc.]</u>, 87 So. 3d [521,] 533 [(Ala. 2011)]."

INV's petition, p. 19.

Gadsden Water agrees that INV "cannot be hauled into court in Alabama based purely on the unilateral actions of third parties," but it argues that "INV's own actions, which were specifically directed toward the state of Alabama, create personal jurisdiction." Gadsden Water's answer in case no. SC-2024-0515, p. 12 (emphasis in original). The actions to which Gadsden Water refers are "owning and maintaining PFAS-application machinery," which Gadsden Water asserts, meant that INV "controlled the use of its PFAS products in carpet mills upstream of Gadsden. This control, along with the knowledge that its products would eventually be discharged downstream into Alabama," means that, according to Gadsden Water, "INV directed pollution toward Alabama." Id.

Gadsden Water seeks support for the foregoing chain of reasoning from this Court's decision in Aladdin Manufacturing. In Aladdin Manufacturing, this Court considered petitions for writs of mandamus from several defendants in Gadsden I and from defendants in a nearly identical case filed by the Water Works and Sewer Board of the Town of Centre ("Centre Water") in the Cherokee Circuit Court. All the defendants in both cases filed petitions for writs of mandamus, seeking

59

orders from this Court directing the circuit courts to dismiss the actions against them based on a lack of personal jurisdiction. See Ex parte Aladdin Mfg. Corp., 305 So. 3d at 221. The allegations by Centre Water and Gadsden Water against the defendants in the actions at issue in Aladdin Manufacturing were essentially identical to the allegations presented by Gadsden Water in Gadsden II:

> "The factual basis proffered by Centre Water and Gadsden Water to support their specific-personal-jurisdiction assertion is that the defendants discharged wastewater containing PFCs that contaminated Centre Water's and Gadsden Water's water sources and that those acts were purposefully directed at Alabama. In addition to identifying each defendant, noting that each was a foreign corporation, and asserting that each company was 'causing injury' in Alabama, Centre Water and Gadsden Water alleged in their complaints that the defendants had used and discharged 'chemical compounds that contain or degrade into PFCs, including, but not limited to PFOA and PFOS' and that the toxic chemicals had contaminated the water at Centre Water's and Gadsden Water's water-intake sites. Centre Water and Gadsden Water also alleged in their complaints that the United States Environmental Protection Agency ('the EPA') had identified industrial wastewater from the defendants' manufacturing facilities as the source of PFCs entering the Conasauga River. Centre Water and Gadsden Water further alleged that the EPA had taken regulatory action in 2002 by publishing rules under the Toxic Substances Control Act to limit the future manufacture and use of PFC-containing chemicals."

Id. at 229 (emphasis added).

60

In <u>Aladdin Manufacturing</u>, this Court granted the petitions of three defendants because they had "present[ed] affidavits controverting the factual allegations in Centre Water's and Gadsden Water's complaints that would establish specific personal jurisdiction (i.e., evidence demonstrating that they did not and had never manufactured or used PFCs and that <u>they did not discharge wastewater containing PFCs in Dalton</u>)," which constituted "a prima facie showing that no specific personal jurisdiction existed as to them" that Centre Water and Gadsden Water had failed to contradict. <u>Id.</u> (emphasis added).

However, a plurality of the Court denied the petitions of the remaining defendants, which the opinion described as entities who

> "own and/or operate carpet-manufacturing facilities that <u>use PFC-containing chemicals or supply PFC-containing chemicals to those facilities. The remaining defendants eventually discharge the toxic chemicals into their industrial wastewater</u>. That wastewater is then treated by Dalton Utilities as its wastewater-treatment plant in Georgia. The PFC-containing water is sprayed by Dalton Utilities over a 9,800-acre Land Application System ('the LAS'), and the runoff from the LAS enters the Conasauga River, a tributary of the Coosa River. The PFC-containing chemicals then travel in the Conasauga River to the Coosa River, which crosses into Alabama, and, finally, contaminates the water at Centre Water's and Gadsden Water's water-intake sites. Centre Water and Gadsden Water further substantiated the jurisdictional allegations in their complaints by presenting documentary evidence in opposition to the motions to dismiss

demonstrating that the remaining defendants had been placed on notice from publicly available reports published by the EPA that the PFCs were entering the Conasauga River. Additionally, Centre Water and Gadsden Water submitted documentary evidence of studies determining that PFC pollution had been introduced into the Coosa River watershed through carpet manufacturers' industrial-wastewater discharges."

Id. at 231-32 (footnote omitted and emphasis added). The plurality concluded that the circuit courts could exercise jurisdiction over the remaining defendants:

"[T]aking Centre Water's and Gadsden Water's jurisdictional allegations as true, we must conclude that the remaining defendants knowingly discharged PFC-containing chemicals into their industrial wastewater, which traveled to Dalton Utilities' facility, where the defendants knew it was being ineffectively treated and where the wastewater was sprayed over the LAS. The remaining defendants further knew that the PFC-containing chemicals entered the Conasauga River, a tributary of the Coosa River, and traveled through the Coosa River into Alabama. The publicly available EPA reports and the published studies demonstrate that the remaining defendants had been placed on notice that the PFC-containing chemicals were polluting the Coosa River upstream from the sites in Alabama where the injuries occurred. Based on the remaining defendants' alleged activities, Centre Water and Gadsden Water filed their causes of action against the defendants. Here, similarly as in Horne[ v. Mobile Area Water & Sewer Sys., 897 So. 2d 972 (Miss. 2004)], Pakootas[ v. Teck Cominco Metals, Ltd., 905 F.3d 565 (9th Cir. 2018)], and Triad Hunter[, LLC v. Eagle Natrium, LLC, 132 N.E.3d 1272 (Ohio Ct. App. 2019)], by virtue of knowingly discharging PFC-containing chemicals in their industrial wastewater, knowing they were ineffectively treated by Dalton Utilities, and

knowing that the PFCs would end up in the Coosa River, which flows into Alabama, the remaining defendants, according to Centre Water's and Gadsden Water's allegations, purposefully directed their actions at Alabama. Such alleged conduct on the part of the remaining defendants in relation to Alabama is not random, fortuitous, or attenuated, Burger King[ Corp. v. Rudzewicz], 471 U.S. [462,] 486, 105 S.Ct. [2174,] 2189 [(1985)], regardless of the distance the chemicals traveled to reach the sites in Alabama where the injuries occurred. Furthermore, as noted above, physical entry into the forum through 'goods, mail, or some other means' is relevant to the specific-personal-jurisdiction analysis. Walden[ v. Fiore], 571 U.S. [277,] 285, 134 S.Ct. [1115,] 1122 [(2014)]. Under this factual scenario, the physical entry of the pollution into Alabama's water source creates the relationship among the remaining defendants, Alabama, and the actions."

Id. at 238 (emphasis added).

Gadsden Water argues that the reasoning employed in Aladdin Manufacturing dictates that it is appropriate for the circuit court to exercise personal jurisdiction over INV.

"INV, by owning and maintaining PFAS-application machinery, controlled the use of its PFAS products in carpet mills upstream of Gadsden. This control, along with the knowledge that its products would eventually be discharged downstream into Alabama, render moot INV's argument that [Gadsden Water's] injuries were caused purely by the unilateral actions of third parties. Ex parte Aladdin, 305 So. 3d at 232. Likewise, because INV controlled the application of its PFAS products, by knowingly allowing their discharge into waterways upstream of Gadsden, INV directed its pollution toward Alabama. This Court has found that a defendant's actions can be purposefully directed toward a forum state when a defendant continues to release a substance with the

knowledge that the substance will travel into the forum state. This is particularly true in water pollution cases. Id. at 237."

Gadsden Water's answer in case no. SC-2024-0515, p. 12 (emphasis added).

The problem with the foregoing argument is that it assumes facts not alleged and it stretches the holding in Aladdin Manufacturing beyond the stated reasoning. First, Gadsden Water has not alleged that INV, by owning some equipment in Dalton carpet mills, "controlled" the application of PFAS in those mills or that INV in any way directed or controlled the discharge of wastewater by those carpet mills. Second, there is no allegation that INV ever discharged any PFAS, whether directly or through wastewater, into the Conasauga River. In Aladdin Manufacturing, the Court did not allow the exercise of personal jurisdiction over certain defendants who "did not discharge wastewater containing [PFAS] in Dalton," but it allowed the exercise of personal jurisdiction over other defendants who "eventually discharge[d] the toxic chemicals into their industrial wastewater." Id. at 229, 231. Thus, the key characteristic in Aladdin Manufacturing for whether personal jurisdiction could be exercised was whether a defendant had knowingly discharged wastewater that contained PFAS. INV indisputably has not

64

discharged any wastewater. Gadsden Water attempts to blur the distinction between INV and the defendants in <u>Aladdin Manufacturing</u> who actively made a choice to discharge toxic wastewater by emphasizing the fact that INV owned and serviced "PFAS application machinery to carpet mills." Gadsden Water's answer in case no. SC-2024-0515, p. 8. But that activity illustrates nothing more than that INV knew PFAS were applied to carpets and possibly that INV knew that PFAS would end up in wastewater. It does not demonstrate that INV played any role in the discharge of PFAS into wastewater or into rivers. At most, Gadsden Water's allegations indicate that INV knew it was foreseeable that PFAS might end up in Alabama waters. But the Court unequivocally stated in <u>Aladdin Manufacturing</u> that "foreseeability alone is insufficient to confer personal jurisdiction." 305 So. 3d at 238. As INV contends, to allow the circuit court to exercise personal jurisdiction over INV under the alleged facts would "start us on a slippery slope" in which "foreseeability alone" is sufficient to exercise personal jurisdiction under the Due Process Clause of the Fourteenth Amendment. <u>Id.</u> at 233. We will not slide in that direction because it would end up eviscerating the limited nature of specific jurisdiction.

In a last gasp argument, Gadsden Water asserts that this Court's decision in <u>Sawyer v. Cooper Tire & Rubber Co.</u>, supra, warrants the exercise of personal jurisdiction over INV in this case. In <u>Sawyer</u>, a product-liability action, this Court adopted and applied the personal-jurisdiction analysis expounded by the United States Supreme Court in <u>Ford Motor Co. v. Montana Eighth Judicial District Court</u>, 592 U.S. 351 (2021). Specifically, <u>Sawyer</u> noted that the United States Supreme Court had determined in <u>Ford</u> that

> "a claim that 'relates to' a defendant's contacts with a forum state could include circumstances in which the defendant 'systematically served a market in [the forum state] for the very [product] that the plaintiffs allege malfunctioned and injured them' in that state, even when the plaintiffs cannot show that the defective product was purchased there. [592 U.S.] at 365, 141 S.Ct. 1017."

<u>Sawyer</u>, __ So. 3d at __. In <u>Ford</u>, the vehicles that had been involved in the accidents that precipitated the lawsuits were originally sold outside the forum states, Montana and Minnesota. However,

> "[b]ecause Ford had systematically served a market in Montana and Minnesota for the very vehicles that the plaintiffs alleged had malfunctioned and injured them in those States, the Supreme Court held that there was a strong '"relationship among the defendant, the forum, and the litigation"' -- the '"essential foundation"' of specific jurisdiction. [592 U.S.] at 365, 141 S.Ct. 1017 (citation omitted). The Supreme Court concluded that this served as a

66

> legitimate basis upon which the forum states could exercise specific personal jurisdiction over Ford. [592 U.S.] at 366-68, 141 S.Ct. 1017."

Sawyer, __ So. 3d at __. In Sawyer, this Court concluded that the facts presented were analogous to those in Ford because Cooper Tire had sold and distributed in Alabama the same model of tire that allegedly precipitated the accident, it had maintained an extensive dealer network in Alabama, and it had marketed the same tire model in Alabama.

Gadsden Water argues that, "[u]nder the Sawyer framework, INV's actions clearly 'relate to' [Gadsden Water's] injuries such that personal jurisdiction exists" because

> "INV owned and maintained its PFAS application machinery. It knew that a necessary byproduct of its PFAS business with carpet mills in Dalton, Georgia resulted in its PFAS waste flowing into Alabama. INV's extensive actions in and relating to Alabama here are analogous to the actions of the defendants in Ford and Sawyer."

Gadsden Water's answer in case no. SC-2024-0515, p. 11.

Putting aside for the moment several potential differences between product-liability actions like Ford and Sawyer and a water-pollution action like Gadsden II, what is obviously missing in this case from INV that was prevalent in both Ford and Sawyer is any evidence of INV systematically serving a market in Alabama in any way, shape, or form.

67

As we noted earlier, INV's sole contact with Alabama consisted of owning equipment at one or two Alabama carpet mills in 2006. That is not remotely analogous to the presence and connections Ford had with the forum states in <u>Ford</u> or that Cooper Tire had with Alabama in <u>Sawyer</u> such that INV could reasonably anticipate being haled into court in Alabama because of that contact. Simply put, Gadsden Water's claims do not "relate to" INV's contacts with Alabama in the manner explained by the United States Supreme Court in <u>Ford</u> and adopted by this Court in <u>Sawyer</u>. Therefore, <u>Sawyer</u> does not dictate that the circuit court may exercise personal jurisdiction over INV.

## IV. Conclusion

Gadsden Water's claims against DuPont and Daikin are precluded by the applicable statutes of limitations because its claims first accrued, at the latest, in September 2016. Therefore, we grant the petition for writ of mandamus filed by DuPont and Daikin; we direct the Etowah Circuit Court to vacate its July 2, 2024, order denying the motions to dismiss filed by DuPont and Daikin and to enter orders dismissing the claims against them. Because the landfill defendants never sought a dismissal of the claims against them based on the affirmative defense of statute of

limitations, we do not grant a petition for a writ of mandamus in their favor to the extent that they requested one.

The Etowah Circuit Court lacks specific personal jurisdiction over INV. Consequently, we grant INV's petition for a writ of mandamus. The circuit court is directed to vacate its July 2, 2024, order denying INV's motion to dismiss the claims asserted against it and to enter an order dismissing Gadsden Water's claims against INV.

SC-2024-0514 -- PETITION GRANTED IN PART AND DENIED IN PART; WRIT ISSUED.

SC-2024-0515 -- PETITION GRANTED; WRIT ISSUED.

Stewart, C.J., and Shaw, Wise, Bryan, Sellers, Mitchell, and McCool, JJ., concur.

Cook, J., recuses himself.